FILED

JUN 0 6 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BASIMA BAHOO, | Case No.: 15cv523-WQH(KSC) |
| Plaintiff, | **REPORT AND RECOMMENDA-TION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | **[Doc. Nos. 13 and 14]** |
| Defendant. | |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her disability insurance benefits. [Doc. No. 1.] Pursuant to Title 28, United States Code, Section 636(b)(1)(B), and Civil Local Rules 72.1(c)(1)(c) and 72.2(a), this matter was assigned to the undersigned Magistrate Judge for a Report and Recommendation.

Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc. No. 13]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 14]; (3) defendant's Opposition to Plaintiff's Motion [Doc. No. 15]; (4) plaintiff's Reply to defendant's Opposition [Doc. No. 17]; and (5) the Administrative Record [Doc. No. 10].

/ / /

Plaintiff's Motion for Summary Judgment challenges the denial of disability benefits on two grounds. First, plaintiff argues that the decision to deny benefits is not supported by substantial evidence, because the ALJ failed to articulate clear and convincing reasons for rejecting her claim that she suffers from disabling pain in her left knee. [Doc. No. 13-1, at p. 11-14.] Second, plaintiff contends that the decision to deny benefits is based on an erroneous finding that she is literate and able to communicate effectively in English. [Doc. No. 13-1, at pp. 2-11.] Defendant asserts that the decision to deny benefits should be upheld, because it is based on substantial evidence and is free of reversible legal error. [Doc. No. 14-1, at pp. 2-10.] After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, this Court RECOMMENDS that the District Court DENY plaintiff's Motion for Summary Judgment [Doc. No. 13] and GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 14].

## I.   *Background and Procedural History*

On January 18, 2012, plaintiff filed an application for supplemental security income benefits (SSI). [Doc. No. 10-5, at pp. 2-11.] Plaintiff's application states that she was born on October 4, 1964. She is not a citizen of the United States but has lived here since June 15, 2010 and has permanent residence status. Plaintiff claimed in her application that her disability began on August 1, 2011 and she is unable to work because of thyroid cancer; gynecological problems; back and knee problems; neck and shoulder pain; high cholesterol; and low blood pressure. [Doc. No. 10-5, at p. 2, 13; Doc. No. 10-4, at p. 2.]

The record includes two completed disability report forms. The first is entitled "Disability Report – Field Office – Form SSA-336-7" ("Disability Report – Field Office"). [Doc. No. 10-6, at pp. 2-4.] This form indicates there was a face-to-face interview with the claimant and the form was completed by interviewer "H. Aguirre" on January 18, 2012. [Doc. No. 10-6, at p. 2, 4.] The interviewer observed that plaintiff had difficulty sitting, standing, and walking. She was also using a cane and wearing a neck

1   brace.  In addition, the interviewer commented that plaintiff appeared to be in pain during

2   the interview "as she kept adjusting herself."  [Doc. No. 10-6, at p. 3.]  However, the

3   interviewer indicated plaintiff did not have any difficulty hearing, reading, understanding,

4   talking, answering, or writing.  [Doc. No. 10-6, at p. 3.]

5       The second is entitled "Disability Report – Adult – Form SSA-3368" ("Disability

6   Report – Adult").  [Doc. No. 10-6, at pp. 5-12.]  Although the form includes responses, it

7   is undated and unsigned.  [Doc. No. 10-6, at p. 12.]  The first set of responses on this

8   form indicates plaintiff can speak and understand English but cannot read or write in

9   English.  [Doc. No. 10-6, at p. 5.]  The second section of the report indicates that plaintiff

10   completed this form.  [Doc. No. 10-6, at p. 5.]  The third section lists the following

11   conditions claimed to limit plaintiff's ability to work:  thyroid cancer, hysterectomy, back

12   problems, pain in neck and shoulder, high cholesterol, low blood pressure, and knee

13   problems.  [Doc. No. 10-6, at p. 6.]  Section four states that plaintiff stopped working on

14   December 19, 2011 because of her medical condition.  [Doc. No. 10-6, at p. 6.]  In

15   section five of the report, it is represented that plaintiff completed three years of college

16   in 1982 and "took courses to become a certified babysitter and work at a daycare" in

17   2011.  [Doc. No. 10-6, at p. 7.]  Reported job history in section six of this form indicates

18   plaintiff worked as a babysitter in a day care business from August 2011 to December 19,

19   2011.  From June 1982 through December 1995, plaintiff worked as a nurse in a hospital.

20   [Doc. No. 10-6, at p. 7.]

21       The record also includes a Work History Report dated and signed on January 28,

22   2012.  [Doc. No. 10-6, at pp. 14-17.]  In handwritten answers on this form, plaintiff

23   represented that she worked as a nurse at a hospital in Iraq from 1982 through 1995.

24   [Doc. No. 10-6, at p. 14, 17.]  This job required plaintiff to push patients from their

25   rooms to the surgery room and to work in the surgery room.  She quit this job to take care

26   of her father and siblings after her mother passed away.  [Doc. No. 10-6, at p. 15.]  From

27   August 20, 2011 through December 22, 2011, plaintiff worked at home taking care of

28   three children for 7.5 hours per day five days per week.  She also stated on the form that

1   she was happy with this "good job" but stopped working because of pain and sickness,
2   including pain and swelling in her left knee. [Doc. No. 10-6, at p. 14.]

3       At the time of her application, plaintiff rented a home for $800 per month and lived
4   with one other relative who paid more than half of the rent. [Doc. No. 10-5, at pp. 3-4.]
5   To pay the rent, plaintiff stated she was borrowing $300 per month from her cousin. In
6   addition, she was receiving food stamp assistance in the amount of $200 per month. At
7   this time, she did not need help with personal care, hygiene, or the upkeep of her home.
8   [Doc. No. 10-5, at p. 4-5.]

9       On February 3, 2012, plaintiff's application for SSI was denied. [Doc. No. 10-4, at
10  p. 2.] She requested reconsideration on March 16, 2012 [Doc. No. 10-4, at p. 7], but her
11  request was denied on April 24, 2012 [Doc. No. 10-4, at p. 10]. On June 25, 2012,
12  plaintiff requested a hearing before an administrative law judge. [Doc. No. 10-4, at p. 15.]
13  A hearing before an administrative law judge was held on August 12, 2013. [Doc. No.
14  10-2, at p. 42.]

15      On August 30, 2013, the ALJ issued a written opinion concluding that plaintiff did
16  not qualify for disability insurance benefits under the SSA, because she had the residual
17  functional capacity to do sedentary work that exists in the regional and national
18  economies. [Doc. No. 10-2, at pp. 22-30.] On September 9, 2013, plaintiff requested
19  review of the ALJ's decision by the Appeals Council. [Doc. No. 10-2, at pp. 17-22.]
20  However, the Appeals Council denied plaintiff's request for review. [Doc. No. 10-2, at
21  pp. 4-6.]

22  **II.   _Standards of Review._**

23      Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary
24  judgment if the movant shows that there is no genuine dispute as to any material fact and
25  the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary
26  judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary
27  material in the form of affidavits, depositions, answers to interrogatories, and admissions.
28  In Social Security appeals, however, the Court may 'look no further than the pleadings

and the transcript of the record before the agency,' and may not admit additional evidence. *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D.Tenn.1978); 42 U.S.C. § 405(g). "[A]lthough summary judgment motions are customarily used [in social security cases], and even requested by the Court, such motions merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits." *Kenney v. Heckler*, 577 F.Supp. 214, 216 (D.C. Ohio 1983).

Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).

## III. *The ALJ's Five-Step Disability Analysis.*

To qualify for disability benefits under the SSA, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 CFR § 404.1520(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At step one, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 CFR § 404.1520(a)(4)(I). "Substantial gainful activity is work activity that is both substantial and gainful." 20 CFR § 416.972. Here, the ALJ concluded plaintiff had not engaged in substantial gainful activity since she filed her application for benefits. [Doc. No. 10-2, at p. 25-26.]

At step two, the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of Social Security regulations. 20 CFR

§ 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 CFR § 404.1521(a). For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the applicant's ability to perform basic work activities will not be considered a "severe" impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 CFR § 404.1521(b)(1)-(6). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

At step two, the ALJ concluded that plaintiff had the severe impairments of left knee conditions and obesity which established only that she was more than minimally affected in her ability to do basic work activities. [Doc. No. 10-2, at p. 26.] Although the ALJ considered the "interplay" of all of plaintiff's medically determinable conditions and whether or not they were severe, the ALJ further concluded that no other medical problems caused any work restrictions. [Doc. No. 10-2, at p. 26.]

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 CFR § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing, he or she must be found disabled. *Id.* In this case, the ALJ concluded at step three that plaintiff's impairments or combination of impairments did not meet or equal a listed impairment. As a result, the ALJ concluded plaintiff was not disabled based on medical considerations alone. [Doc. No. 10-2, at p. 26.]

If an impairment does not meet or equal a Listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe. 20 CFR § 404.1520(e), § 404.1545(a)(2).

1   "Residual functional capacity" is "the most [an applicant] can still do despite [his or her]

2   limitations." 20 CFR § 404.1545(a)(1). The ALJ must determine whether the applicant

3   retains the residual functional capacity to perform his or her past relevant work.  20 CFR

4   § 404.1520(a)(4)(iv).

5       If the applicant cannot perform past relevant work, the ALJ–at step five–must

6   consider whether the applicant can perform any other work that exists in the national

7   economy.  20 CFR § 404.1520(a)(4)(v).  While the applicant carries the burden of

8   proving eligibility at steps one through four, the burden at step five rests on the agency.

9   *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  The ALJ must consider all of

10  plaintiff's medically determinable impairments, including any pain that could "cause a

11  limitation of function" and any impairments that were not "severe," and then determine

12  plaintiff's residual functional capacity to perform other work in the national economy.  20

13  CFR §§ 404.1520; 404.1545; 416.929.  "In determining [the claimant's] residual

14  functional capacity, the ALJ must consider whether the aggregate of [the claimant's]

15  mental and physical impairments may so incapacitate him that he is unable to perform

16  available work."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997), as

17  *amended on reh'g* (Sept. 17, 1997).  As noted above, "residual functional capacity" is

18  "the most [an applicant] can still do despite [his or her] limitations."  20 CFR §

19  404.1545(a)(1).

20      Here, the ALJ acknowledged at step four that plaintiff did not have any past

21  relevant work.  [Doc. No. 10-2, at p. 27.]  Although plaintiff started a daycare center out

22  of her home in 2011, she only worked for a few months and did not work consistently.  In

23  addition, her nursing work in Iraq from 1982 to 1993 was too remote to be considered.

24  [Doc. No. 10-2, at p. 25.]

25      Considering the totality of plaintiff's symptoms and pain, the ALJ concluded at

26  step five that she has the residual functional capacity to perform sedentary work.  In

27  reaching this determination, the ALJ concluded plaintiff "is not illiterate in or unable to

28  communicate in English" but even if she was, she would still be able to perform

7

sedentary work based on the vocational expert's testimony. [Doc. No. 10-2, at p. 28-29.] The ALJ also acknowledged that plaintiff must use a cane for prolonged ambulation but indicated this was not material "as prolonged walking is not a demand of sedentary work." [Doc. No. 10-2, at p. 27, 30.] In addition, the ALJ specifically considered that plaintiff testified to the following: (1) she has pain in her left knee that is worse than before her February 22, 2012 surgery; (2) she uses a cane to walk and has done so since 2011; (3) she could only stand for ten minutes at a time, walk for ten to fifteen minutes with a cane without a break, and walk for 30 minutes with breaks; (4) she uses a walker twice a day; and (5) she was unable on five occasions to pass a test to obtain a driver's license so she had to rely on her brother for transportation. [Doc. No. 10-2, at p. 27.]

## IV.   *Medical Evidence.*

### A.   *Medical Evidence.*

Medical records submitted in support of plaintiff's claim for disability benefits include medical notes and reports from two primary care physicians and several specialists. In her written opinion concluding that plaintiff does not qualify for benefits, the ALJ did not dispute that plaintiff had the following medical issues that are listed on her application and supported by her medical records: thyroid cancer; gynecological problems; back and knee problems; neck and shoulder pain; high cholesterol; and low blood pressure. For example, the records show that plaintiff had a total abdominal hysterectomy in Iraq on November 16, 2008. On September 1, 2011, plaintiff mentioned to her primary care physician that she had pelvic pain since undergoing the hysterectomy. [Doc. No. 10-7, at p. 45, 122.] The records also show that plaintiff had surgery on December 2, 2010, with no complications, to remove a "thyroid nodule in the right lobe" that tested positive for cancer. [Doc. No. 10-7, at p. 3-4, 5-6, 8-9, 13, 18-20.] However, a detailed summary of all of these records is not included here, because there is only one medical condition that remains in dispute based on the arguments made in plaintiff's Motion for Summary Judgment, and that is the extent of pain and limitations resulting from an injury to plaintiff's left knee and/or from surgery done to repair her left knee.

1  The following is a brief summary of the medical records pertaining to the condition of
2  plaintiff's left knee.

3      On September 1, 2011, plaintiff had an appointment with her primary care
4  physician, Dr. Jerry M. Held, and complained of pain in her left knee.  Dr. Held referred
5  her to Grossmont Imaging for an MRI and to physical therapy for evaluation and
6  treatment.  She declined to have a steroid injection to address her knee pain.  [Doc. No.
7  10-7, at p. 45.]  However, she was given anti-inflammatory and pain medication by
8  injection.  [Doc. No. 10-7, at pp. 46-47.]

9      On October 14, 2011, plaintiff had an "initial orthopedic evaluation" of her left
10 knee by Dr. Luis C. Maas, III.  [Doc. No. 10-7, at p. 116.]  Based on his examination, x-
11 rays, and an MRI scan, Dr. Maas concluded plaintiff had a "complex tear through the
12 posterior horn of the medial meniscus at its junction with the posterior root ligament."
13 His results also noted other abnormalities and degenerative changes.  [Doc. No. 10-7, at
14 p. 15, 116-117.]

15     Next, plaintiff had a follow-up appointment with Dr. Held on October 28, 2011.
16 [Doc. No. 10-7, at pp. 37-38.]  Dr. Held's notes state there is a "[t]ear of lateral cartilage
17 or meniscus of knee" and "probable indication for arthroscopic repair."  [Doc. No. 10-7,
18 at p. 38.]  Plaintiff reported continued and increasing left knee pain and difficulty
19 walking.  Dr. Held prescribed pain medication and a cane.  [Doc. No. 10-7, at p. 38.]

20     On October 31, 2011, Dr. William C. Eves completed a "follow up evaluation" of
21 plaintiff's knee.  According to Dr. Eves, plaintiff reported severe, continuous pain for
22 three months, along with instability, joint swelling, weakness, stiffness, and night pain.
23 Treatment thus far included only Tylenol and Ibuprofen.  [Doc. No. 10-7, at p. 114.]
24 When he examined plaintiff's knee, he noted there was "swelling and edema" and
25 "evidence of medial meniscal tear."  [Doc. No. 10-17, at pp. 114-115.]  He discussed
26 various treatment options with plaintiff, and she indicated she wanted to proceed with
27 activity modification and physical therapy.  [Doc. No. 10-7, at p. 115.]
28 ///

1   Plaintiff had an initial evaluation with a physical therapist on December 7, 2011.

2   [Doc. No. 10-7, at p. 109.]  An assessment by the therapist indicated plaintiff's symptoms

3   were consistent with the diagnosis of a meniscal tear as she had limited knee function and

4   pain with weight bearing activities.  Plaintiff was unable to walk for ten minutes or use

5   stairs without pain.  The therapist's plan of care included supervised exercises, ice packs,

6   electrical stimulation, joint mobilization, manual stretching, massage, and myofascial

7   release.  [Doc. No. 10-7, at p. 110-111.]

8   On January 16, 2012, plaintiff indicated to Dr. Held that she continued to suffer

9   from knee pain and had difficulty walking.  She also indicated she had increasing neck

10   pain for four months with radiation to her arm and weakness in her hand while holding a

11   cup.  [Doc. No. 10-7, at p. 29-31.]  Pain medications were prescribed for knee pain, and

12   plaintiff was referred to an orthopedic specialist for possible knee surgery.  Treatments

13   discussed included exercise and weight loss to reduce risk factors; pain medication;

14   possible knee surgery; knee and back braces; and a soft cervical collar.  [Doc. No. 10-7,

15   at p. 30-31.]

16   In a progress evaluation dated January 20, 2012, plaintiff's physical therapist

17   reported some progress but indicated that plaintiff could only walk ten or twenty minutes

18   before pain increased.  She was also unable to walk up and down stairs or squat without

19   pain and could only stand for five minutes without aggravating her pain.  [Doc. No. 10-7,

20   at pp. 106-108.]

21   As noted above, plaintiff submitted her application for SSA disability benefits on

22   or about January 18, 2012.  [Doc. No. 10-5, at pp. 2-11.]  On February 2, 2012,

23   Dr. B. Lew reviewed plaintiff's medical records and prepared a Case Analysis in

24   connection with her application for disability benefits.  Based on his review, Dr. Lew

25   questioned whether plaintiff would qualify for disability benefits and indicated an

26   evaluation would be necessary to determine whether plaintiff was capable of at least

27   sedentary work.  [Doc. No. 10-7, at p. 78-80.]

28   / / /

1  |  As of February 20, 2012, Dr. Held described plaintiff's left knee pain as "stable."
2  |  [Doc. No. 10-7, at p. 136.] At this time, plaintiff also complained of pain in her spine,
3  |  shoulders, hands, and wrists. [Doc. No. 10-7, at p. 136.] Dr. Held's notes also refer to
4  |  "intermittent pain in other joints," neck pain with radiation to the left arm, and weakness
5  |  in the left hand while holding a cup. [Doc. No. 10-7, at p. 136-137.] Plaintiff's
6  |  medications included Tylenol, Percocet, and Vicodin for pain. [Doc. No. 10-7, at p. 136.]
7  |  Dr. Held continued plaintiff's medications and indicated she needed to follow up with her
8  |  orthopedic specialist for "possible surgical intervention." [Doc. No. 10-7, at p. 136-137.]
9  |  On February 22, 2012, plaintiff had knee surgery at Scripps Mercy Hospital in
10 |  Chula Vista, which was performed by Dr. Eves. No complications were noted in the
11 |  surgical report and she was released after the surgery with a pain pump catheter. [Doc.
12 |  No. 10-7, at pp. 83-84.] The medical records include follow-up treatment records with
13 |  Dr. Eves. [Doc. No. 10-7, at pp. 95-105.] To treat post-operative pain, plaintiff was
14 |  prescribed Vicodin and Percocet. Post-operative treatment included ice, elevation, and a
15 |  knee immobilizer. In addition, Dr. Eves referred plaintiff to physical therapy. [Doc. No.
16 |  10 -7, at p. 95.]
17 |  On March 14, 2012, Dr. Held noted that plaintiff's knee pain was "improving."
18 |  [Doc. No. 10-7, at p. 133-134.] However, Dr. Held noted that plaintiff complained of
19 |  intermittent neck pain with occasional radiation to her left arm. [Doc. No. 10-7, at p.
20 |  133.] He also indicated there was some depression which was mild with some chronicity
21 |  and worsening following knee surgery and chronic pain. [Doc. No. 10-7, at p. 134.]
22 |  Medications included Percocet and Tylenol for pain. At this time, plaintiff was seeking a
23 |  knee brace, spine collar, cane, shower chair, and diapers for incontinence. [Doc. No. 10-
24 |  7, at p. 134.] Dr. Held also referred plaintiff to a psychiatrist. [Doc. No. 10-7, at pp. 134-
25 |  135.]
26 |  On May 30, 2012, about three months after her knee surgery, Dr. Eves completed a
27 |  post-surgical orthopedic evaluation. Plaintiff reported "no significant improvement
28 |  compared to before the surgical procedure." She was unable to bear her weight on the

leg where the surgery was completed. [Doc. No. 10-7, at p. 89.] Dr. Eves' report states that despite post-operative treatment, plaintiff's "post-operative pain has been severe." [Doc. No. 10-7, at p. 89.] Although the incisions from the surgery had healed and there was no sign of infection, there was "continued swelling around the knee." [Doc. No. 10-7, at p. 90.] Dr. Eves discussed treatment options with plaintiff, and she elected to begin physical therapy with the expectation that she would begin partial weight bearing and advance to full weight bearing as tolerated and discontinue using crutches. [Doc. No. 10-7, at p. 90, 94.]

On June 1, 2012, at a follow-up appointment with Dr. Held, plaintiff "denie[d] improvement" in her pain. She was offered a steroid injection but declined. Dr. Held referred plaintiff for additional diagnostic testing to rule out other possible causes of leg pain. [Doc. No. 10-7, at pp. 130-132.]

At her appointment with Dr. Held on July 10, 2012, plaintiff reported continuing depression and night mares. [Doc. No. 10-7, at p. 126-127.] Once again, she "denie[d] improvement" in her knee pain. She was referred to pain management for low back pain. [Doc. No. 10-7, at p. 126-128.]

On September 7, 2012, plaintiff again reported pain in her spine "with marginal control with medium dose narcotics," anti-inflammatory medications, or muscle relaxants. [Doc. No. 10-7, at p. 156.] Plaintiff was referred to pain management and an orthopedic specialist for "possible future MRI" of the spine. Her anti-inflammatory and narcotic pain medications were continued. [Doc. No. 10-7, at p. 158.]

A "post-operative evaluation" of plaintiff's knee was completed in Dr. Eves' office on December 20, 2012. [Doc. No. 10-7, at p. 147.] The history section of the report states that plaintiff reported pain, swelling, weakness, and "no significant improvement compared to before the surgical procedure." [Doc. No. 10-7, at p. 147.] In addition, she had "not heard from physical therapy." [Doc. No. 10-7, at p. 147.] However, the assessment section of the report for this date states that plaintiff "overall is doing well" and "has noticed improvement in [her] knee pain." [Doc. No. 10-7, at p. 148.] Although

some swelling and tenderness was noted, an examination of plaintiff's left knee and leg indicated she had good range of motion in her knee (with pain) and normal muscle strength in her leg muscles. [Doc. No. 10-7, at p. 148.] Physical therapy was authorized. Plaintiff was instructed to begin physical therapy exercises and return for further evaluation in two months. [Doc. No. 10-7, at p. 148.]

At the next appointment with Dr. Eves on February 21, 2013, plaintiff reported "a burning sensation" in her left knee that was intermittent and moderate to severe. [Doc. No. 10-7, at p. 148.] She also reported joint swelling, weakness, stiffness, numbness, and tingling radiating down to her toes. However, the notes for this date state that: "The patient's symptoms have been slowly improving with conservative treatment." [Doc. No. 10-7, at p. 149.] A physical examination of plaintiff's left knee yielded positive results, such as "no swelling," only a little tenderness, improved range of motion, etc. [Doc. No. 10-7, at p. 150.]

On March 5, 2013, plaintiff had an appointment with Dr. Held, who said in his notes that plaintiff was "[d]oing well" and had "no specific complaints" other than difficulty losing weight. [Doc. No. 10-7, at p. 170.] Dr. Held's assessment notes state that the "[t]ear of lateral cartilage or meniscus of knee . . . , now asx" or asymptomatic. [Doc. No. 10-7, at 172.] Plaintiff was given a strict diet to follow for weight loss. [Doc. No. 10-7, at p. 172.] However, at the next appointment with Dr. Held on May 21, 2013, plaintiff's prescription for Percocet was continued to address knee pain, and a follow-up appointment was scheduled for an orthopedic evaluation. She declined a "trial nerve blocker." [Doc. No. 10-7, at p. 174.]

On June 20, 2013, Dr. Eves wrote a letter stating that plaintiff "will likely require continued orthopedic care for a minimum of 6 months, which may involve follow up office visits, radiographs, and physical therapy. She will be unable to work, and will be temporarily disabled during this 6 month duration." [Doc. No. 10-7, at p. 176.].

Dr. Eves' medical notes for June 20, 2013 state that plaintiff "has continued to have significant pain and swelling in the knee. [She] has had subsequent treatment with

1  activity modification, non-steroidal anti-inflammatory drugs (NSAIDS), pain

2  medications, and physical therapy exercises for over 3 months, but [she] continue[s] to

3  have significant pain and swelling in the knee that affects [her] daily activities." [Doc.

4  No. 10-7, at p. 152.]  Dr. Eves discussed treatment options, and plaintiff indicated she

5  wanted to proceed with a "series of injections for the knee" when she returns for her next

6  visit in four weeks. [Doc. No. 10-7, at p. 152.]

7        On July 5, 2013, plaintiff had an appointment with Dr. Held.  [Doc. No. 10-7, at

8  pp. 177-178.]  Dr. Held's notes state that plaintiff is "doing very well."  [Doc. No. 10-7,

9  at p. 178.]  He told plaintiff to continue to follow up with her orthopedist, Dr. Eves, and

10  indicated he was "happy to update [plaintiff's] letter for [her] lawyer."  [Doc. No. 10-7, at

11  p. 178.]  Dr. Held's letter of July 5, 2013 states that he is a specialist in internal medicine

12  and plaintiff is currently his patient.  His letter further states that plaintiff "currently

13  suffers from severe pain in the left knee and less pain in the neck and low back with

14  radicular radiation to the arm and leg.  She has found this pain to be severe 8/10 and

15  restrictive of daily activities and her happiness in general.  [¶][Plaintiff] estimates that she

16  can rarely bend, stoop, climb and never kneel or crawl.  Balance and walking gait are

17  difficult and she can left less than 10 lbs.  She is able to sit and stand for less than 2 hours

18  cumulatively in an 8 hour work day.  She states she cannot reach over head and use of

19  hand and fingers on both hands is restricted, maximum 30 to 60 minutes. . . .  She has a

20  [follow up] with Dr. William Eves of orthopedics and underwent a [left] knee

21  arthroscopy . . . .  Her improvement apparently has been only mild to this point.  [¶]She

22  continues to take Tylenol, [non-steroidal anti-inflammatory drugs], and medium dose

23  narcotics with intermittent physical therapy with only mild relief."  [Doc. No. 10-7, at p.

24  179.]

25   **B.    _Evidence of English Language Ability in Plaintiff's Medical Records_.**

26        There are a number of notations in medical notes indicating that a translator or

27  interpreter was present to assist plaintiff during visits with her doctors.  [_See, e.g._, Doc.

28  No. 10-7, at p. 6 (Dr. Nassir (11/1/10): "communicates through a language interpreter");

p. 44 (Dr. Held (9/1/11): "Translator"); p. 37 (Dr. Held (10/28/11): "translator used"); p. 136 (Dr. Held (2/20/12): "translator used"); p. 130 (Dr. Held (6/1/12): "translator used"); p. 123 (Catling, NP (7/31/12: "Arabic trans"); p. 153 (Muchnik, PA-C (8/30/12): "Translator used"); p. 159 (Catling, NP (9/13/12): "Arabic trans"). Other medical records are silent as to whether a translator was present.

On October 2, 2013, Dr. Eves, who is plaintiff's orthopedic doctor, wrote a letter in connection with plaintiff's claim for disability benefits. The letter states that plaintiff "has poor English and our office is requesting a translator for every visit." [Doc. No. 10-7, at p. 180.] Dr. Held wrote a similar letter on October 15, 2013 stating that plaintiff has been his patient since May 2011 and "[s]he appears unable to speak or read English and needs a translator in Arabic/English on clinic visits." [Doc. 10-7, at p. 181.]

### C. *Hearing Testimony.*

#### 1. *Plaintiff.*

At the time of the hearing, plaintiff testified through an interpreter. [Doc. No. 10-2, at p. 47.] She said she was 49 years old. When asked by the ALJ about her education, plaintiff responded: "First 15 years, next, 19 years." [Doc. No. 10-2, at p. 48.] However, she said she did not have a college degree. [Doc. No. 10-6, at pp. 48-49.]

Plaintiff testified she had been living in the United States for about three years and three months. She indicated she can understand English but cannot speak the language. [Doc. No. 10-2, at p. 49.] She is able to read and write in her native language. [Doc. No. 10-2, at p. 50.]

From 1982 to 1995, plaintiff testified she worked as a nurse but did not go back to work after her mother passed away because she had to take care of the house. [Doc. No. 10-2, at p. 49.]

When she came to the United States, she could not work as a nurse "because of the language barrier, but [she] applied for a babysitting license." [Doc. No. 10-2, at p. 49.] She was "very happy" with this work, but she started to have "severe pain" in her knee and it became "very swollen." [Doc. No. 10-2, at p. 49.] In February of 2012, she had

knee surgery but stated that "the pain is even greater than before [the surgery]." [Doc. No. 10-2, at p. 50.]

In response to questions by her attorney, plaintiff testified that a notation in her medical records indicating she goes to a gym every day is incorrect. She does not have a gym membership and does not ever go to a gym. [Doc. No. 10-2, at p. 50-51.] When asked how much she can lift and carry, plaintiff said "[t]wo to three tomatoes" or "[l]ess than one pound probably." [Doc. No. 10-2, at p. 51.]

In August or the beginning of September of 2011, plaintiff started a day care out of her apartment. [Doc. No. 10-2, at p. 52.] When plaintiff's counsel asked how many children were in the day care, the ALJ said, "It's not [substantial gainful income], so let's move on." [Doc. No. 10-2, at p. 52.]

When her knee problem started in 2011, plaintiff started using a cane to walk, and she was still using the cane at the time of the hearing. [Doc. No. 10-2, at p. 51.] The cane was prescribed by Dr. Held. [Doc. No. 10-2, at p. 52.] Plaintiff can stand for about ten minutes at a time but must then sit down. With breaks, she can walk for 30 minutes. Without breaks, plaintiff can walk for 10 to 15 minutes. She cannot walk without her cane. She has also used crutches and a walker. For exercise, plaintiff uses the walker twice a day inside her apartment to "go back and forth." [Doc. No. 10-2, at p. 53-54.]

Plaintiff does not drive. She has taken a test to get a driver's license five times but has not passed. Nor does she take public transportation. She is dependent on her brother or friends to drive her places. [Doc. No. 10-2, at p. 54.]

### 2. *Vocational Expert.*

At the hearing, the vocational expert was asked whether there would be jobs for an individual of plaintiff's age and education who could perform sedentary work but lacked any work history, was illiterate in English, and could stand but needed a cane for prolonged ambulation. [Doc. No. 10-2, at p. 55.] The vocational expert responded that such an individual could learn simple repetitive tasks and perform a job such as "eye-dropper assembler," "lens inserter," or "sack repairer." [Doc. No. 10-2, at p. 55.] It was

16

1  also the opinion of the vocational expert that these jobs are available in significant
2  numbers both regionally and nationally. [Doc. No. 10-2, at p. 55-56.]

3  **V.  _Discussion._**

4      **A.  _Substantial Evidence Standard._**

5      As noted above, the final decision of the Commissioner must be affirmed if it is
6  supported by substantial evidence and if the Commissioner has applied the correct legal
7  standards. _Batson v. Comm'r of the Social Security Admin._, 359 F.3d 1190, 1193 (9th
8  Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are
9  upheld if supported by inferences reasonably drawn from the record. _Id._ If there is
10 evidence in the record to support more than one rational interpretation, the District Court
11 must defer to the Commissioner's decision. _Id._ Substantial evidence means "such
12 relevant evidence as a reasonable mind might accept as adequate to support a
13 conclusion." _Osenbrock v. Apfel_, 240 F.3d 1157, 1162 (9th Cir. 2001). The Court must
14 weigh both the evidence that supports and detracts from the administrative ruling.
15 _Tackett v. Apfel_, 180 F.3d 1094, 1097 (9th Cir. 1999).

16     **B.  _Whether the ALJ Properly Rejected Plaintiff's Excess Pain Testimony?_**

17     As noted above, plaintiff had knee surgery in February of 2012. At the hearing on
18 August 12, 2013, plaintiff testified that "the pain is even greater than before [the
19 surgery]." [Doc. No. 10-2, at p. 50.] According to plaintiff, "it is clear that a finding of
20 disability would result if [plaintiff's] testimony were credited as true," but the ALJ did
21 not state legally sufficient reasons for rejecting this testimony. [Doc. No. 13-1, at p. 14.]
22 In other words, plaintiff contends the evidence shows she is disabled by knee pain, but
23 the ALJ erroneously discredited or rejected her testimony without providing sufficient
24 reasons.

25     In _Light v. Social Security Administration_, 119 F.3d 789 (9th Cir. 1997), the Ninth
26 Circuit held that the ALJ cannot discredit or reject claims of "excess pain" based solely
27 on a lack of objective medical support in the record. _Id._ at 792-793. "In assessing the
28 credibility of a claimant's testimony regarding subjective pain or the intensity of

symptoms, the ALJ engages in a two-step analysis. [Citation omitted.] First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.' [Citations omitted.]  If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give 'specific, clear and convincing reasons' in order to reject the claimant's testimony about the severity of the symptoms. [Citations omitted.]  At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).' [Citation omitted.]  In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.' [Citation omitted.]  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, [such as] . . . 'whether the claimant engages in daily activities inconsistent with the alleged symptoms.' [Citation omitted.] While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, [citation omitted], the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. [Citation omitted.]  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. [Citation omitted.]" *Molina v. Astrue*, 674 F.3d 1104, 1112-1113 (9th Cir. 2012).

For the most part, the ALJ rejected plaintiff's testimony about her pain based on credibility grounds.  According to the ALJ, a number of factors undermined the credibility of plaintiff's testimony.  [Doc. No. 10-2, at p. 27.]  First, plaintiff testified that her left knee pain is "greater" than it was prior to surgery [Doc. No. 10-2, at p. 50], but this conflicts with a recent medical record, which "described a mild improvement." [Doc. No. 10-2, at p. 27.]  In addition, the medical records generally cite plaintiff's assertions of "no significant improvement" but do not "relate claims of worsening." [Doc. No. 10-2, at p. 27.]

Second, it was the ALJ's view that plaintiff's credibility was undermined by several other statements she made in her paperwork or her testimony because they appear to be exaggerated. [Doc. No. 10-6, at 27.] These include plaintiff's statement in her paperwork that she lifted 50 pounds or more frequently in her child care job. She also stated that the heaviest weight she lifted in her child care job was 100 pounds or more. [Doc. No. 10-6, at p. 15.] Then, in her hearing testimony, plaintiff said she could only lift and carry "two to three tomatoes" or less than one pound. According to the ALJ, this testimony "seems to have no basis" (*i.e.*, there is nothing in the medical records to suggest plaintiff could not lift and carry more than one pound). [Doc. No. 10-2, at p. 51.] In addition, plaintiff stated in her paperwork that her former job as nurse in Iraq required her to work fifteen hours per day for seven days per week. [Doc. No. 10-6, at p. 15.]

Third, it was the ALJ's view that objective medical evidence in the record indicated plaintiff "did well post-surgically." [Doc. No. 10-2, at p. 28.] For example, medical notes from an examination on December 20, 2012, about ten months after plaintiff had knee surgery on February 22, 2012, indicate she was "overall doing well" and had near normal range of motion and motor strength in her knee. [Doc. No. 10-7, at p. 147-148.] Other medical records from 2012 and 2013 include similar statements. For example, Dr. Held's medical notes from September 7, 2012 state "knee surgery with good result." [Doc. No. 10-7, at 156. *See also* 10-7, at p. 162-163 (Dr. Held's medical notes from October 9, 2012, stating "decreased use of narcotics" and noting positive results of knee examination with no mention of pain or swelling in knee); 10-7, at pp. 170-172 (Dr. Held's medical notes dated March 5, 2013 stating "[d]oing well/no specific complaints other than difficulty losing weight"; positive results of knee examination; and "tear of lateral cartilage or meniscus of knee, current-836.1, now asx" (*i.e.*, now asymptomatic) ].

The ALJ also noted that "if the results of knee surgery were as poor as [plaintiff] now claims, she would have availed herself of additional treatments, such as injections or greater dosages of medications. [Doc. No. 10-1, at p. 27. *See also* 10-7, at p. 173-175

1  (indicating plaintiff declined "trial nerve blocker" during her appointment with Dr. Held

2  on May 21, 2013).]  The last set of medical notes in the record from Dr. Eves dated

3  June 20, 2013 do state that plaintiff wanted to proceed with a "series of injections for the

4  knee" in four weeks at her next orthopedic appointment.  [Doc. No. 10-7, at p. 152.]

5  However, the hearing before the ALJ took place about six weeks later on August 12,

6  2013 [Doc. No. 10-2, at p. 45], and the Court was unable to locate any supplemental

7  evidence in the record to indicate whether plaintiff had these additional treatments and, if

8  she did, whether they provided any relief.  In addition, the ALJ observed that plaintiff is

9  treated with pain medications, and there is nothing to indicate she has any adverse side

10  effects from her medications.  [Doc. No. 10-2, at p. 27.]  In other words, pain treatment

11  without side effects is further evidence that plaintiff is able to perform sedentary work.

12       In sum, the ALJ provided clear, convincing, and specific reasons for rejecting

13  plaintiff's testimony indicating that she cannot work because she suffers from severe,

14  disabling knee pain in excess of that indicated by objective medical evidence. For the

15  reasons outlined above, the ALJ's decision to reject plaintiff's pain testimony is

16  supported by substantial evidence in the record and is not based solely on a lack of

17  objective medical evidence.  Therefore, this Court concludes that the ALJ met her burden

18  of providing clear, convincing, and specific reasons based on substantial evidence for

19  rejecting plaintiff's excess pain testimony.

20  ***C.***   ***Whether Substantial Evidence Supports the ALJ's Finding that Plaintiff***

21  ***Is Literate and Able to Communicate in English?***

22       Plaintiff does not dispute the part of the ALJ's residual functional capacity

23  assessment concluding she is restricted to sedentary work.  [Doc. No. 13-1, at p. 3.]

24  Rather, plaintiff argues she is disabled under the Vocational Guidelines despite the ALJ's

25  finding she is capable of sedentary work, because she is illiterate and/or unable to

26  communicate in English.  She contends that substantial evidence in the record does not

27  support the ALJ's contrary finding that she is both literate and able to communicate in

28  English. [Doc. No. 13-1, at pp. 3-11.]

SSA regulations distinguish between someone who is illiterate and someone who is unable to communicate in English.  SSA regulations define "illiteracy" as follows: "Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. ***Generally, an illiterate person has had little or no formal schooling***."  20 C.F.R. § 416.964(b)(1) (emphasis added).

With respect to an inability to communicate in English, SSA regulations state in part as follows: "Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do.  It generally doesn't matter what other language a person may be fluent in." 20 C.F.R. § 416.964(b)(5).

SSA regulations also require the ALJ to consider information about the claimant's education:  "We will ask you how long you attended school and whether you are able to speak, understand, read and write in English and do at least simple calculations in arithmetic. We will also consider other information about how much formal or informal education you may have had through your previous work, community projects, hobbies, and any other activities which might help you to work." 20 C.F.R. § 416.964(b)(6).

Here, the ALJ correctly noted there is conflicting evidence in the record concerning plaintiff's "lingual abilities." [Doc. No. 10-2, at p. 28.]  First, the record includes the Disability Report – Field Office, which was completed on January 18, 2012 as a result of a face-to-face interview between plaintiff and an interviewer identified as "H. Aguirre." [Doc. No. 10-6, at p. 3-4.]  In the Observations section of the Disability Report, the interviewer indicated plaintiff was coherent and did not have difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, seeing, using her hands, or writing.  [Doc. No. 10-6, at p. 3.]

1   In pertinent part, the form in the record entitled Disability Report – Adult includes
2   the following questions and responses:

3       1.G  Can you speak and understand English?  Yes.
4              If "NO", what language do you prefer?  [No response.]
           If you cannot speak and understand English, we will provide
5              an interpreter, free of charge.
6       1.H  Can you read and understand English? No
                        * * * *
7       2.F  Who is completing this report?  The person who is applying
8              for disability.

9   [Doc. No. 10-6, at p. 5.]

10   Next, the record also includes a Work History Report form that was completed by
11   hand and signed on January 28, 2012.  [Doc. No. 10-6, at pp. 2-17.]  The responses are
12   written in simple English using the first person, indicating plaintiff filled the form out
13   herself and has a basic ability to read, write, and follow simple instructions in English.
14   For example, the form states: "List all of the jobs that you had in the 15 years before you
15   became unable to work because of your illnesses, injuries, or conditions."  [Doc. No. 10-
16   6, at p. 14,]  The handwritten response states that plaintiff worked in a hospital as a nurse
17   from 1982 to 1995 and worked at home taking care of children in 2011.  Referring to the
18   job in child care, the response goes on to state in part as follows:  "I stop working I cant
19   too much pain in all my body. Im very happy with this job I dont have kids put[sic] Im
20   very sick I cant do anything when have cancer all time. . . ."  [Doc. No. 10-6, at p. 14.]

21   At the hearing before the ALJ, the record shows plaintiff was assisted by an
22   interpreter.  [Doc. No. 10-2, at p. 25.]  In her decision, the ALJ acknowledged plaintiff's
23   testimony that she understands but cannot speak English and does not drive as she has not
24   been able to pass the test to obtain a driver's license despite five attempts.  [Doc. No. 10-
25   2, at p. 25, 49, 54.]  As outlined above, there are a number of notations in medical notes
26   made by plaintiff's doctors indicating she communicated with them through an
27   interpreter during medical appointments.  On the other hand, there are a number of
28   medical notes that do not include any such notation.  Although two of plaintiff's doctors

1 wrote letters about plaintiff's "lingual abilities" in connection with her claim for
2 disability benefits, they are not very helpful.  Dr. Eve's letters says plaintiff has "poor
3 English."  [Doc. No. 10-7, at p. 180.]  It does not indicate plaintiff cannot communicate at
4 all in English.  Likewise, Dr. Held's letter only states that plaintiff "*appears* unable to
5 speak or read English."  [Doc. No. 10-7, at p. 181 (emphasis added).]

6      As noted above, plaintiff testified she was 49 years old at the time of the hearing.
7 She was born in Iraq and went to school there for 15 or 19 years.  She also worked as a
8 nurse in Iraq for more than ten years from 1982 to 1995.  At the time of the hearing, she
9 had only been living in the United States for about three years.  [Doc. No. 10-2, at p. 25,
10 48-49.]

11      In the Disability Report – Adult, which was submitted in connection with
12 plaintiff's application for benefits, it is represented that plaintiff's education included
13 three years of college.  [Doc. No. 10-6, at p. 7.]  Because of the language barrier, she had
14 not attempted to find work as a nurse in the United States.  However, she did apply for "a
15 babysitting license" [Doc. No. 10-2, at p. 49.]  Plaintiff's Disability Report states that she
16 "[t]ook courses to become a certified babysitter and work at a daycare."  [Doc. No. 10-6,
17 at p. 7.]  As stated in her Work History Report, plaintiff took care of three children in her
18 home for a period of 7.5 hours per day five days per week.  She only stopped doing this
19 job after about three months because of pain in her knee.  [Doc. No. 2, at p. 49; Doc. No.
20 10-6, at p. 14.]

21      Based on the evidence in the record, the ALJ reasonably concluded as follows:
22 "Given her presentation to various examiners, responses on SSA forms and her recently
23 completed education and work, it appears that the claimant, although limited in skills, is
24 not unable to communicate or illiterate in English.  It is difficult to accept that the
25 claimant would have completed and worked in child care without some basic faculty in
26 the English language."  [Doc. No. 10-2, at p. 25.]  Although acknowledging that the
27 record included conflicting evidence, the ALJ made a finding that plaintiff "is not
28 illiterate in or unable to communicate in English."  [Doc. No. 10-2, at p. 28.]  In addition

to the evidence cited above, the ALJ indicated this finding was based in part on her "ultimate assessment of [plaintiff's] credibility." [Doc. No. 10-2, at p. 28.] For the reasons outlined above in the previous section, the ALJ had reason to doubt plaintiff's credibility.

The ALJ also explained that she referred to the SSA's Vocational Guidelines directed to individuals limited to sedentary work, *i.e.*, 20 C.F.R., Part 404, Subpart P, Appendix 2 § 201 *et seq.* In this regard, Section 201(h)(1) states as follows: "[A] finding of 'disabled' is warranted for individuals age 45-49 who: (i) Are restricted to sedentary work. (ii) Are unskilled or have no transferable skills. (iii) Have no past relevant work or can no longer perform past relevant work, ***and*** (iv) Are unable to communicate in English or are able to speak and understand English but are unable to read or write in English." 20 C.F.R., Part 404, Subpart P, Appendix 2 § 201(h)(1) (emphasis added).

Other Vocational Guidelines considered by the ALJ are Sections 201.17, 201.18, 201.21 and 201.22 of the Vocational Guidelines. [Doc. No. 10-2, at p. 29.] These sections are part of "Table No. 1—Residual Functional Capacity:  Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)."  The listed sections pertain to individuals aged 45 to 49 with various skill and education levels.

All of the listed sections call for a finding of "not disabled" except for Section 201.17.  Plaintiff contends that the ALJ should have found her "disabled" under Section 201.17, because she is illiterate and unable to communicate in English. However, under Section 201.17, individuals who are limited to sedentary work and are illiterate or unable to communicate in English should only be considered "disabled" if their previous work experience is either "unskilled" or "none."  20 C.F.R., Part 404, Subpart P, Appendix 2 §§ 201.17.  The ALJ reasonably concluded that Section 201.17 does not apply to plaintiff, because she has an advanced education and a skilled work history as a nurse "albeit distant." [Doc. No. 10-2, at p. 29.] According to the ALJ, plaintiff "obviously has skills that place her in better stead than an individual who has

1  never worked or has only done unskilled work." [Doc. No. 10-2, at p. 29.]  In addition,
2  she "has recent education and employment in this country (at least semi-skilled) that,
3  though arguably not relevant work, clearly places her in [a] better position to work than
4  an individual with no or unskilled work" and she failed in this "greater than sedentary job
5  only because of her knee problems" (*i.e.*, not because of a lack of skills or language
6  abilities). [Doc. No. 10-2, at p. 29.]

7  The ALJ also reasonably concluded that the remaining guidelines pertaining to
8  individuals aged 45 to 49 (*i.e.*, Sections 201.18, 201.21, and 201.22) do not directly apply
9  under the facts and circumstances presented, but plaintiff "more closely approximate[s]"
10  Rules 201.21 or 201.22.  Under Section 201.18, individuals limited to sedentary work
11  who have limited English language skills and previous work experience that qualifies as
12  "unskilled" or "none" are "not disabled."  Under Sections 201.21 and 201.22, individuals
13  limited to sedentary work who have a high school education or more and skilled or semi-
14  skilled work experience with either transferable or non-transferable skills are also "not
15  disabled."

16  In support of her Motion for Summary Judgment, plaintiff challenges the weight
17  and reliability of the evidence relevant to the issue of her literacy and ability to
18  communicate in English.  For example, plaintiff argues there is an absence of evidence to
19  show she had to communicate in English in order to obtain a child care license.  Without
20  evidentiary support in the record, plaintiff contends that the licensing process is "rather
21  simple," and plaintiff could have filled out the paperwork and satisfied the requirements
22  to obtain the license in her native language and/or with the help of someone who could
23  translate for her.  Without evidentiary support, plaintiff also argues that the written forms
24  she submitted in support of her application for benefits "were filled out by others," so the
25  ALJ should not have relied on these forms.  [Doc. No. 13-1, at p. 7-8.]  In addition,
26  plaintiff contends that questions on the SSA's Disability Report – Adult concerning the
27  applicant's language abilities are compound and confusing, which caused plaintiff to over
28  represent her "true literacy skills."  [Doc. No. 13-1, at p. 5.]

1      Plaintiff's arguments are unconvincing, because they are unsupported and/or

2  contradicted by the record.  There is only one form from the initial application process

3  that includes a notation indicating it was completed by someone other than plaintiff.  This

4  is the Disability Report – Field Office, which was completed by a face-to-face

5  interviewer on or about January 18, 2012, at the time plaintiff was completing the initial

6  paperwork for her application.  [Doc. No. 10-6, at p. 3.]  As noted above, the interviewer

7  indicated plaintiff did not have any difficulty hearing, reading, understanding, talking,

8  answering, or writing.  [Doc. No. 10-6, at p. 3.]  Although the form includes space for

9  observations and other comments, the interviewer did not in any way indicate there was

10  any language barrier during the interview.  [Doc. No. 10-6, at p. 3.]  There is no other

11  evidence in the record to prove with any degree of certainty that plaintiff was unable to

12  complete the forms on her own or that someone else completed the forms for her because

13  she was unable to do so.  Nor would it be appropriate for the Court to consider evidence

14  on this issue that is outside the administrative record.  42 U.S.C. § 405(g); *Baker v.*

15  *Barnhart*, 457 F.3d 882, 891 (8th Cir. 2006).

16      In sum, there was conflicting evidence in the record regarding plaintiff's ability to

17  understand, speak, read, and write in English.  However, it was the ALJ's duty to resolve

18  any conflicts in the evidence and to make determinations about credibility.  *Connett v.*

19  *Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003); *Edlund v. Massanari*, 253 F.3d 1152, 1156

20  (9th Cir. 2001).  The ALJ's decision indicates that she considered all relevant and

21  probative evidence and appropriately resolved the conflict.  For the reasons outlined more

22  fully above, it is further apparent that the ALJ had reason to doubt plaintiff's credibility.

23  The evidence in the record is consistent with a finding that plaintiff has basic literacy and

24  communication skills in English, but she prefers to use a translator when she must

25  communicate and understand at a more advanced level, such as when she is speaking

26  with a physician or participating in the hearing with the ALJ.  In other words, the record

27  includes substantial evidence from which the ALJ could reasonably infer that plaintiff's

28

1   English language abilities were limited but not as much as plaintiff claimed in her

2   testimony.

3       Finally, the ALJ's conclusion that plaintiff is "not disabled" under the Vocational

4   Guidelines is further supported by the testimony of the vocational expert.  The

5   hypothetical presented to the vocational expert at plaintiff's hearing included an

6   assumption that an individual limited to sedentary work, who needed a cane for

7   prolonged ambulation, was "illiterate in English."  [Doc. No. 10-2, at p. 55.]  In response,

8   the vocational expert testified there were significant numbers of sedentary jobs in the

9   regional and national economy for such an individual.  [Doc. No. 10-2, at p. 55.]

10       Based on the foregoing, the ALJ's decision to deny benefits is not based on an

11   erroneous finding that plaintiff is literate and able to communicate effectively in English.

12   Substantial evidence in the Administrative Record supports the ALJ's conclusion that

13   plaintiff has limited proficiency but is not illiterate or unable to communicate in English.

14   Substantial evidence further supports the ALJ's conclusion that plaintiff is not disabled

15   under the Vocational Guidelines, even though her English language skills are limited,

16   because she retains the residual functional capacity to do sedentary work that is available

17   in significant numbers in the regional and national economies.

18                                 ***Conclusion***

19       Based on the foregoing, this Court concludes that substantial evidence in the

20   Administrative Record supports the ALJ's August 30, 2013 decision that plaintiff did not

21   qualify for disability benefits because she retained the residual functional capacity to do

22   sedentary work in a significant number of jobs available in the regional and national

23   economies.  IT IS THEREFORE RECOMMENDED THAT THE DISTRICT COURT:

24       1.    DENY plaintiff's Motion for Summary Judgment [Doc. No. 13]; and

25       2.    GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 14].

26       This Report and Recommendation is submitted to the United States District Judge

27   assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local

28   Rule 72.1(d).  Within fourteen (14) days after being served with a copy of this Report and

1    Recommendation, "any party may serve and file written objections."  28 U.S.C. §

2    636(b)(1)(B)&(C).  The document should be captioned "Objections to Report and

3    Recommendation."  The parties are advised that failure to file objections within this

4    specific time may waive the right to raise those objections on appeal of the Court's order.

5    *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

6            IT IS SO ORDERED.

7    Dated:  June ___, 2016

8

9                                                    Hon. Karen S. Crawford
                                                     United States Magistrate Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15cv523-WQH(KSC)